Thank you, Your Honor. Good afternoon and may it please the court. Stan Gibson on behalf of Gary Topolowski and the corporate defendants. The District Court should be reversed in this matter for two independent reasons. First, the disgorgement remedy was improper because AECOM never provided reasonably certain evidence of profits to ensure that the 1.8 billion dollar award was not a penalty. Second, AECOM, the subsidiary that's at issue in this litigation, never established that it sustained an injury in fact to establish Article 3 standing. Turning to the first point, the disgorgement remedy ordered by the District Court cannot be justified based on three press releases and that's all it was based on. Those three press releases reflect potential projects on construction. There is no evidence in the record, and AECOM provided none, that those construction projects ever went forward, that any revenue was generated, or that any profits were made. The Lanham Act is very clear in that it requires the before the burden shifts to the defendant to do anything. In this situation, the District Court found that because the defendants had not brought forward any evidence and that the burden had shifted based on failures to provide discovery and whatnot. That was improper. Counsel, maybe I could jump in and just for summary judgment and the motion for reconsideration. I guess my, I do understand the difficult position the District Court found itself in, and let me put it to you this way. The court said, listen, you guys have come forward now, the motion for reconsideration stage, with some good arguments about these press releases. Yeah, they don't speak to actual revenues, you know, put in, put into the defendant's pockets, but when you all were here on the original motion for summary judgment, you never contested the 1.8 billion dollar amount. You never made any arguments to suggest that somehow the press releases weren't reliable indicators of revenues, or that the revenues were never received. You all are coming in too late in the District Court's view, complaining about that now, and basically I just went with the uncontested figure that the plaintiffs put forward. So how do you respond to that in terms of the timing of when you first presented these arguments you're giving to us now in the District Court? Well, the counsel below did not put forward a separate statement that explicitly said these facts are disputed. That is correct. That is precisely correct, Your Honor. In terms of what they did do, is they did submit a declaration from Mr. Topolewski, which said that to his knowledge, no bids were ever received. They also submitted a Rule 37 objection to the damages on the ground that they weren't disclosed in initial disclosures. Now, the District Court overruled that issue, but they did make some effort to oppose it. They just did not challenge the specific calculation. Now, with respect to the local rules, didn't counsel have to make some kind of dispute for the statement of undisputed facts to prevent the court from taking it as given? The local rules require you to do that, but the local rules can't trump Ninth Circuit law or Federal Rule Procedure 56. Those cases and that rule provide that the plaintiff still has to come forward with evidence before the burden shifts, even if the defendant does nothing, doesn't oppose that part of the summary judgment. The plaintiff still has to come forward with evidence, and here there's no evidence. Well, the plaintiff came forward with some evidence. I mean, I understand that you think the not very persuasive evidence, but it is some evidence that there would have been these revenues, and once the plaintiff put that forward and made a statement of undisputed fact, as I understand the local rules, it was your obligation or whoever was counsel before you to contest that number, and absent contesting it, there was some evidence in support of those numbers, and I don't understand why the District Court wasn't within the local rules to just accept those numbers at that point. Well, because the press releases aren't evidence of revenue. They're at most evidence that a project may be started in the future, but that's not a statement that they made revenue, that they made money. That's what has to be submitted, and the rules, the local rules, Rule 56... Well, what are the dollar figures? I mean, what are the dollar figures? They're revenue that if the project happened, presumably they're revenue figures that would eventually happen, right? Yes, it's speculation that if the projects went forward, they would have been paid for that, but in this situation... But if the projects didn't go forward, then why not write something in your statement of disputed, you know, disputing the statement of undisputed fact saying these projects haven't begun or they didn't, they haven't happened or something like that? To be certain, Your Honor, that would have been the preferred course. There's no question that the prior counsel, that would have been a better course of action. That is definitely true, but in this situation where we have the record that we have, there's still not enough to shift the burden. There's no evidence of any revenue, and that's what's required under the Lanham Act. There has to be some evidence. They can't just submit... Let's say they submitted three blank pieces of paper. That wouldn't be evidence. You couldn't say plaintiffs or defendants have earned 1.8 billion dollars of revenue, and it's an undisputed fact because we say it is, and all they do is attach three blank pieces of paper. That's to come forward with some evidence. You can't just say it in your statement of undisputed facts, and then if the defendant doesn't oppose it, you get to say it's a deemed admission. That's not how it works. There has to be some evidence to support what the finding is, and here there's none. And why isn't a statement that purports to be from the defendant that it won these projects that are gonna earn this much money some evidence that that money was going to It's not evidence that there was revenue paid. It's evidence there might be an expectation in the future of revenue, but that's not revenue that's received, and that's what the Lanham Act requires. This is a very extreme award. It needs to be analyzed and scrutinized, and that's the district court's job is to look at the evidence and make sure it's supported. To say that 1.8 billion dollars, especially given given the conduct and the force of the defendant's practice, you don't know if these press releases are real. The plaintiff could have done more. The district court recognized that and said, ordinarily I would expect the plaintiff to do more, but then it shifted the burden because the defendant hadn't cooperated in discovery. That's not the way the Lanham Act works. The plaintiff has to do more. It's their burden to prove that these were revenues, not just that they could be anticipated revenues. They have to show some evidence. How were the plaintiffs supposed to do that when they couldn't get the Well, there's third-party discovery that can be taken. They could have taken discovery from any of the people who were supposedly awarding these contracts to look and see whether they in fact occurred. They could have looked for other evidence in the press that these projects, these were huge, supposedly huge projects. And so I'll ask your friend when it's when it's their turn, but did the other side introduce any efforts that they had made to do an SOIA request to the EPA or to use a letters rogatory process to obtain documents from British Columbia or Thailand to see if any project had gone forward or any contract was signed? Not that I'm aware of, your honor. I do not believe there was any third-party discovery that was taken, whether through a Freedom of Information Act request or some international letters rogatory. I don't believe any of that was done. So in the absence of that, there's no evidence of any revenue. And for that reason, the district court improperly then shifted the burden to the defendants. And that was improper under the Lanham Act. So for that reason alone, this should be remanded. And the plaintiffs are without a remedy here. I think that several of the cases make the point that you may have situations where damages are difficult to ascertain. You may have a defendant that's not cooperating in discovery. And that's why the Lanham Act has statutory damages. And the case can be remanded back for the district court to look at statutory damages as an alternate. Well, counsel, is there anything about the Lanham Act that would prevent the district court from making an enormous damage award as a sanction for just ongoing and outrageous discovery violations? Would that be something that would be within the district court's power? I don't believe so, Your Honor, because the Lanham Act is my second reason why the district court's order on discovery... Putting aside the...I'm sorry, were you going to talk about standing or something else? I was going to talk about that the Lanham Act has to be compensatory and not punitive. And that's a key aspect. So the district court cannot, as an evidentiary sanction or a monetary sanction for violating discovery orders, issue a huge award. That would violate the Lanham Act's requirement and this court's precedent that an award under the Lanham Act must be compensatory and not punitive. Could the district court, as a discovery sanction, though, say something like, well, plaintiffs couldn't get your financial records. What they have are these press releases. I'm going to assume, given the discovery abuses, that 10% of the money actually was earned. And set a number. I think the district court, with further briefing, could do something like that, Your Honor. I think that there has to be a reasonably certain amount. So what is particularly troubling here is that the district court recognized on the original summary judgment motion order that the press releases were troubling. Then on the motion to reconsider, again, recognized that it had been troubled by these press releases. It could have done further analysis at that point or required specifically the defendants to come forward with evidence at that point so that it could make some estimate. Well, I mean, there had been several discovery orders telling the defendants that they had to come forward with their financial documents and they nevertheless didn't. Correct? That is correct, Your Honor. I think that there is a reference to a to a to Citibank as as a holder of some of the records and that the corporate defendants could not get the evidence from Citibank themselves. But that could have been subpoenaed. There's other things that could have been done before. There's just an award of one point eight billion dollars based on on three repress releases that don't describe revenue that was actually earned or profits that were made. That's the difficulty here. And again, I think that this may be a situation where there's statutory damages that are most appropriate. But to just look at these press releases... How much are the statutory damages? I apologize. I don't remember that in your brief. Did you explain how that would work? We didn't address the statutory damages as I was reading the cases again, Your Honor, that we talked about supplemental briefing, which could be part of the statutory damages. I don't have a figure of statutory damages before me. I think that would be something the district court would look at on remand. I think they're based on number of uses of the mark and things like that. But it would give the district court something to look at, as opposed to these press releases, which again, in our view, just are not evidence of revenue. And with that, Your Honor, I'd like to reserve the remainder of my time, if I might. Okay, very good. Let's hear from counsel for the other side. Thank you, Your Honors. Good afternoon or good morning, depending on where you sit. May it please the court. There are two issues before the court. One is standing and the other... One, first of all, is whether or not the district court... I'm sorry, whether or not AECOM established standing through either its complaint or through the record as a whole. The second, which appears to be the issue more of interest, is whether or not the district court was within its discretion to issue the disgorgement award that it did. And the answer under this court's precedence is a resounding yes. I will take the issue of the press in many other cases, say that where a defendant precludes the plaintiff from getting evidence, the court can rely on even crude damages. Counsel, I have a question for you. If you had, say, in a hypothetical case, a deposition where a that to the district court for summary judgment with an undisputed fact, with the undisputed fact saying the light was red and nobody objected, could the district court enter summary judgment that the light was green based on a depo that said the light was red because you said the reverse is an undisputed fact? I don't think so, but I also don't think that's the issue here. Well, but counsel, the district court said these press releases say defendants have claimed to earn revenue totaling $1.8 billion. In my read of the press releases, they don't remotely say that. They say that there were three contracts awarded, but even for like $100 contracts, that is not saying that there is revenue earned. I mean, that you're awarded a contract, even if you say it, and even if that can be admitted against you, that says nothing about how much revenue you actually took in. So I don't see how these press releases can support the undisputed statement, defendant claimed to earn revenue totaling $1.8 billion. Please point me to any place in any of the three press releases that actually tie those two things together. The press release is an on which this court has has cited approvingly the district court there and the Second Circuit affirmed the district court there relying on recorded statements simply of someone saying we made these sales. That's what these press releases are. This doesn't say we made these. This doesn't say we made these sales. These say we signed a contract when you're talking about an announcement that you were awarded a contract for a some certain with details. This is not unlike what counsel said. This is not a blank piece of paper. None of them are. They are detailed announcements of contracts that the the appellant claim they entered. They never denied them and they never says it says they were like for the $1.2 billion they've been awarded. That say they got a nickel, but it is, but the court doesn't have to look. The court can rely on many, many different types of evidence, particularly where the defendant has frustrated the ability of the plaintiff to get more certain evidence. And here the defendant frustrates your ability to, for example, do an FOIA request to the EPA or the Bureau of Land Management to see if there was a $570 million contract. Well, by telling us they were going to produce their their financial records until suddenly they had no financial records. Actually, they did. Did did they frustrate you from trying to obtain letters of rogatory to get some documents from from Thailand about whether there actually was or wasn't a $1.2 billion project? Respectfully, we had a year to do discovery or less, and it is not our obligation to go scour the planet to get evidence that the plaintiff, the defendants are obligated to give us that they said they were going to give us that the court ordered them to give us and that they never gave us. And then after summary judgment was after we filed our motion for summary judgment and they were at risk of sanctions again, they said, Oh, we don't have it. And so it is we shouldn't have to go to to get from to get evidence that the plaintiff, the defendants have it at a certain point when when the defendants make it difficult, it allows the plaintiff and the district court to rely on far less certain evidence. And that's on them. Isn't it? Isn't it clear here that there never were any contracts with with with these entities? I mean, $1.2 billion is a huge project. And it was never built by these guys, right? I don't know. I think it was. And I will I will tell you this. You you think you think the defendants in this case, built a $1.2 billion project in Thailand? Whether they ever actually built it, I believe that they were pitching contracts, and I believe that they were getting contracts. Now, let me explain why. In his deposition, Gary Topolowsky testified that the reason they wanted different corporations, the reason they they resurrected the first one, they resurrected the second one. They named another one later on. Several years later, they named another one. Why? Because they wanted to have contracts. They wanted to have different entities be able to do different things. And one of them was mining. Note, there was a contract for mining. One of them was for infrastructure. There was a contract for infrastructure. One of them was for environmental cleanup. He admitted that at deposition. We never understood why they had four corporations, why they needed to have another and then later on he testified at deposition. It was because they wanted they needed a different corporation to do different types of work. If they weren't getting contracts, why did they need to have different corporations? Can I ask you? Sorry to interrupt. Can you just speak to the this this question? Is there evidence in the record that these corporate entities were able to perform the contracts they claim they had been awarded? Well, the reason Topolowsky was involved was because he was the one with the construction expertise. He had construction equipment. He was there to get a license. He he pitched a contract to an AECOM entity. So if he wasn't able to do that work, I don't understand why he was trying to pitch a contract to an AECOM entity. I'm asking. Yeah, I'm not asking. I hear what you're saying. But I'm asking for more hard evidence in the record that shows that these corporations were actually, as Judge Bennett was suggesting, they were in a position to go to Indonesia or wherever this project was going to be built and actually construct something worth $1.2 billion. Is there evidence that they had the capacity to do that? Because my impression from the record is that these entities were, you know, kind of flim flam operations that weren't anywhere close to being able to get on the ground and do that kind of work. And, you know, I will tell you, I thought that was the case at the time. No, obviously, we can't. We can't know because they didn't turn over anything. But what we can know and what we do know is that they, for a decade, they they put on this charade of being Morrison Knudson when they got caught. They didn't just say, oh, all right, we haven't gotten anything anyway. They fought it for years. And, Councilor, my problem here is when you say we can't know, am I still, am I still on line? We're still here. I think Judge Watford's, the image closed, but I think he's on. I'm still with you guys. Okay. All right. So you say you can't know, but when I'm looking at the harbor, a 600 acre loadout storage yard and 35 miles of new resource roads and 12 what appear to be gantry cranes and a new standalone power station. I mean, if these were actually built, there would be evidence that they were built. I mean, putting aside the question of whether the defendants did it, which I think would also be, you'd be able to pretty easily find out, but certainly whether or not they were built or anybody started the construction, it couldn't have been that hard to figure out, did somebody build a new harbor in Thailand? Well, I believe it was in Indonesia, but... Sorry, Indonesia. Okay. Justin, getting on a plane and going to Indonesia and trying to find, or somehow trying to find out from the Indonesian government, I don't know how we would find this out, but I do know that this was a detailed press release, that it had all the indicia of being reliable and under the law of this circuit, the district court was entitled to infer that this was a legitimate press release, that they got the person with whom they contracted with, actually paid them. Now, I will also add, it was particularly reasonable to do a summary judgment, which said, wait, that didn't happen. Now, Mr. Gibson said he doesn't think that these were anything other than blank pieces of paper. Well, they are far more than blank pieces of paper, they are very detailed, and there is nothing that prevented them from refuting them, nothing. And any reasonable person, as the court said in Intel, any reasonable defendant would have just come forward and said, didn't happen, these are not the sales, these are not the costs, whatever it is, we dispute it. It would have been very easy. The problem is, they didn't want to turn over their financial records, because then we could have gotten more concrete information than we got here, and we would have been able to collect, because we would have known where their bank accounts were, and Mr. Gibson also mentioned the Citibank account. There was no mention of that Citibank account during the discovery period. There was no mention of that Citibank account until they were about to get sanctioned again. It was long after, it was long after we had filed our summary judgment motion that they suddenly had a Citibank account. Did we understand the district court here as resting its summary judgment ruling on a sanction, a discovery sanction? No, I don't. I think what the district court did was consistent with the Ninth Circuit precedents in DSPT, in Intel, in many other cases. The district court said, look, they met their burden, however slight, the burden now shifts to you. And we met our burden with undisputed evidence, and that has to count for what could have happened or why could have happened, doesn't matter. What matters is the federal rules of civil procedure required us to come forward with some evidence from which the court could make reasonable inferences, and the standard depends on the circumstances of the case. We did that. The district court found we met our burden. The burden shifted to them. They did nothing. And we shouldn't be penalized because they made a mockery of the district court, which is effectively what they're asking the court to do here. Can I ask our video operator to let me back in the meeting, perhaps, if that's possible, because I can't see the clock now, so I apologize, Ms. Torres, I don't know if you are within your time or over your time at this point. I have a minute left, it looks like, a little over a minute left. Okay, sorry. Sorry, please continue. You know, I do want to address briefly the issue of punitive versus compensatory. There is the standard in the Ninth Circuit is, you're back, it can't be punitive, that must be compensatory, but that comes up when the district court seeks to raise or increase the amount issued, awarded, you know, over what it calculated. That didn't happen here. Or in the cases that appellants cite, where they include more revenue from more than just the bad conduct, where they include more than just the ill-gotten revenue. Here, we don't have that. All we asked for were the revenues in the press releases where they were masquerading as Morrison-Penninson. So it is not, and this court has held and other courts have held, it is not a penalty to impose an award where simply it's just the calculation of the ill-gotten gains. My time is almost up, but I'd like to just conclude by saying, affirming the district court does nothing other than issue an order consistent with this court's precedents. Reversing the district court would not only upend those precedents, it would reward the behavior of the litigants in the court below where they made a mockery of the district court. Thank you. Okay. Thank you, counsel. We have a little bit of time left for rebuttal. Thank you, Your Honors. Briefly, in terms of the punitive versus compensatory nature, what counsel just stated is not the law in the Ninth Circuit. It is not only when the district court is enhancing damages that it has to make sure it's not punitive. It's well-established that the Lanham Act awards are equitable in nature and any award has to be compensatory and not punitive, and that's been the law in the Ninth Circuit for decades with Lindy Penn, with 56 Hope, onto traffic school. They all make that point. In terms of the evidence in the record, Mr. Topolowsky did submit a declaration. Counsel referenced that he was the one who would have had the capability to do this work. His declaration, which was before the district court on summary judgment, stated that he wasn't aware of any bids and aware of any work and never got any contractor's licenses for this company. That's the evidence in the record. In short, Your Honors, the press releases are not reasonably certain evidence. They have to be under Ninth Circuit law before the burden shifts. The district court shifted the burden by saying, normally the plaintiffs wouldn't have done enough, but in this situation, because the defendants frustrated discovery, I'm going to shift the burden. That was not the correct analysis. The correct analysis was to look to see if the plaintiffs had put forward sufficient evidence of revenue. Here they had not. There could have been further briefing or further work on statutory damages. And Your Honor, on behalf of Mr. Topolowsky and the corporate defendants, we believe the district court should be reversed and remanded with instructions from the court. And with that, I'll finish and let's take questions. Doesn't appear so. So thank you very much to both of you for your arguments. The case just argued is submitted. We are adjourned for the day. Your Honors, if I may, I would just like to thank you. I realize that we're all here today when your days would have been cleared because of my personal situation, and I wanted to thank you all. And thank you, Mr. Gibson. Oh, of course. Yes. No, no, no worries. And no need to thank us. We're happy to make the accommodation.  We are adjourned. Thank you, Your Honor.
judges: Watford, Friedland, Bennett